Robert Lee **WILLIAMS** #105750

v.

**STATE OF MARYLAND.**

Civ. No. 71–160–K.

United States District Court,
D. Maryland.

March 28, 1974.

April 4, 1974.

Nevett Steele, Jr., Baltimore, Md., for petitioner.

Francis B. Burch, Atty. Gen., of Md., Clarence W. Sharp and Donald R. Stutman, Asst. Attys. Gen., of Md., Baltimore, Md., for respondent.

FRANK A. KAUFMAN, District Judge.

Robert Lee Williams, presently confined in the Maryland State Penitentiary, and represented herein by counsel appointed by this Court, seeks habeas corpus relief for the first time. On June 15, 1963 Williams was arrested on various charges including, *inter alia,* assault with intent to murder, none of which charges were factually related to those which resulted in the conviction attacked herein. Following his June 15, 1963 arrest, Williams was placed in custody. That custody has continued uninterruptedly since June 15, 1963. On No-

vember 26, 1963, Williams was served with an additional arrest warrant charging him with murder.

On January 23, 1964, after a trial before Judge J. Harold Grady in the Criminal Court of Baltimore commencing on January 21, 1964, Williams was convicted on the assault charge. Six days later, on January 29, 1964, Williams' jury trial on the murder charge, Judge Charles D. Harris presiding, began in the Criminal Court of Baltimore. On January 31, 1964 Williams was found guilty in that trial of first degree murder and on May 13, 1965 he was sentenced to a life term by Judge Harris in connection therewith. On that latter date, Williams was also sentenced in the assault case to a term of fifteen years by Judge Grady, that sentence to be served consecutively with the life sentence imposed in the murder case.

Timely appeals to the Court of Appeals of Maryland were noted in each case. During the pendency of those appeals the Court of Appeals of Maryland filed its opinion in Schowgurow v. State, 240 Md. 121, 213 A.2d 475 (1965).[1] On January 11, 1966, both of the cases involving Williams were remanded by the Court of Appeals for further proceedings in the light of *Schowgurow*. In accordance with those remands, on March 10, 1966 Williams' motions to dismiss the indictments in the two cases were granted. On June 28, 1966 Williams was reindicted on both the assault and the murder charges.

More than two years after the June, 1966 indictment was returned, Williams was tried on the assault with intent to murder charge in the Criminal Court of Baltimore and found guilty thereof on October 8, 1968. On that same date, the trial judge, Judge Solomon Liss, sentenced Williams to fifteen years, said term to commence as of the time of Williams' arrest on June 15, 1963. Wil-

liams' said assault conviction was affirmed on appeal by the Court of Special Appeals of Maryland on June 6, 1969. Subsequently, the Court of Appeals of Maryland declined further discretionary review. Williams does not in any way contest herein the validity of his confinement under the sentence imposed by Judge Liss.

On July 17, 1969, nearly three years and one month after his reindictment for murder, Williams' jury trial before Chief Judge Dulany Foster commenced. On July 18, 1969 the jury returned a verdict of guilty of first degree murder (without capital punishment); and on July 23, 1969, after denial of Williams' motion for a new trial, a life sentence was imposed by Judge Foster, said sentence to begin at the expiration of the fifteen-year sentence Williams was then serving for assault. On August 4, 1970 Williams' 1969 murder conviction was affirmed in a per curiam opinion by the Court of Special Appeals of Maryland. That Court, however, remanded Williams' case in order that his commitment might be corrected so as to afford him credit for the time served between the date of his original conviction for murder and the date on which his original indictment was dismissed pursuant to *Schowgurow*. Thereafter, the Court of Appeals of Maryland, in the exercise of its discretion, refused to undertake any further review.

In its unreported August 4, 1970 per curiam opinion, the Court of Special Appeals (at pp. 2–6) summarized the testimony in Williams' July 1969 murder trial as follows:

> Detective Howard Corbin testified that he was the investigating officer in the death of Theresa Barnes which had occurred on July 27, 1962. The autopsy performed upon Theresa Barnes was admitted into evidence by stipulation. The autopsy revealed the

---

1. In *Schowgurow* the Court of Appeals held that any defendant indicted by a grand jury from which citizens who had not demonstrated their respective beliefs in God were excluded was entitled, if his conviction had not become final, to a new trial if he elected to claim that entitlement.

cause of death as multiple, blunt force injuries of the head and neck producing in the brain a subdural hematoma over the right cerebrum and extensive subarachnoid hemorrhage and partial obstruction of the pharynx, larynx and trachea by blood and mucus. A vaginal smear was positive for the presence of sperm.

Clarence Merriweather testified as follows concerning the events of July 27, 28, 1962. At the time he was living at 1202 Lexington Street, the scene of the murder. At approximately 7:30 p. m. on July 27, 1962, Merriweather arrived at the home of the appellant, Robert Lee Williams, to attend a party given by Williams and his wife. After the party had progressed for some four hours an altercation arose, as a result of which appellant asked Merriweather if he would ride with Williams and Theresa Barnes to Merriweather's apartment. The three entered the appellant's car and drove to Merriweather's apartment where they were met by Sylvia Briscoe and Louis Williams, the appellant's brother, who were sitting in the front room of the apartment. After their arrival, two other girls joined the group, Eleanor Hunter and Mary Pratt, known as Apple Pie. The appellant and Barnes went into the kitchen and Merriweather, Hunter and Pratt went into the back yard at approximately 12:00 midnight. After about fifteen minutes Apple Pie left and went home to Hunter's apartment. Merriweather and Hunter were sitting on the wall in the yard drinking when Merriweather heard a groan from the kitchen and asked the appellant what was going on. The appellant replied that nothing was going on. Ten minutes later, Merriweather heard another groan, went to the kitchen door to investigate and was met by appellant who stated that everything was all right. An hour later, Merriweather heard a scream from the kitchen and the appellant emerged from the back door with a handkerchief wrapped around his hand. Appellant took Eleanor Hunter home, and Merriweather returned to the house. He passed through the kitchen on the way to his bedroom and saw Barnes lying on a mattress but did not speak to her. On the morning of July 28, 1962 Merriweather was awakened by Louis Williams and they proceeded to the kitchen where they found Barnes on the mattress with her eyes and mouth swollen. Merriweather concluded that the girl was dead and he and Louis carried the body outside. Merriweather and Louis proceeded to Eleanor Hunter's house where they found appellant and Hunter asleep on a bed in the basement. They told the appellant Barnes was dead and he replied "Well, I must have hit that girl too hard." Appellant told everyone to keep quiet and no one would get into any trouble.

Eleanor Hunter substantiated Merriweather's testimony as to the events of the night of July 27th after her arrival at Merriweather's apartment. After Apple Pie had left and she and Merriweather were sitting in the back yard, she entered the house to go to the bathroom. She went through the kitchen and saw the appellant and Barnes lying on the mattress. Barnes requested to be shown where the bathroom was and while she was in the bathroom with Barnes, Hunter noticed that Barnes' mouth was swollen and that she had been crying. Upon returning to the kitchen, Hunter told the appellant not to hit Barnes anymore and appellant replied "Okay." Hunter testified that while in the back yard she heard moaning and screaming coming from the kitchen on several occasions. She testified that when appellant was awakened the next morning at her house and Merriweather said "You must have hit the girl awful hard," appellant stated he didn't mean to do it.

The testimony of Sylvia Briscoe from a prior proceeding was then introduced into evidence over defense objection. Briscoe testified that she

was babysitting at Merriweather's house when first Louis Williams, then Robert Williams, Merriweather and Barnes, and then Hunter and Pratt arrived. She and Louis were seated in the front room and appellant and the deceased were in the kitchen. Louis told her to go outside the apartment and locked the door. She reentered the apartment through the kitchen door, and saw Barnes lying on the mattress with her skirt up and her blouse open. The appellant was getting off the mattress and pulling his pants up. Briscoe left the house to purchase some hamburgers and upon her return saw Barnes still on the mattress in the kitchen. Barnes' face and neck were swollen and there was blood in her nose and ears. Briscoe's testimony concluded the State's case in chief and appellant moved for judgment of acquittal which was denied.

Mary Pratt, also known as Apple Pie, testified that on the evening of July 27, 1962 she accompanied Eleanor Hunter to Clarence Merriweather's apartment. Pratt testified that upon their arrival, Hunter saw Merriweather and Barnes in the kitchen, broke the kitchen door down, and argued with Merriweather. Pratt later saw the appellant leave the house, get in his car and drive away. After the appellant left, Pratt saw Barnes in the kitchen sitting up drinking some water.

The appellant testified in his own behalf as follows: On the evening of July 27, 1962 he and his wife were giving a party and ran out of ground beef. He went to Sagel's Market, met Merriweather and Barnes there and invited them to the party. During the party an argument occurred between Barnes and appellant's wife and the

appellant, in separating them, pushed Barnes against a radiator and she bumped her head. Merriweather then asked appellant to drive him and Barnes to Merriweather's apartment, which appellant did. While at Merriweather's apartment he saw Eleanor Hunter kick in the back door and argue with Merriweather and Barnes. Appellant took Hunter outside to calm her down and they proceeded to Hunter's home where they had sexual relations. Appellant denied killing Theresa Barnes. * * *

In his petition herein Williams contends that he is unconstitutionally being restrained by the sentence imposed upon his conviction for murder[2] for the following reasons, literally transcribed:

1.  Incompetent Counsel
2.  Insufficient Evidence
3.  Suppression Of Defense Evidence
4.  Denial Of Appointment Of New Counsel, by court
5.  Denial Of Credit of Time served awaiting trial
6.  Prejudice Statements to jury by Prosecuting Attorney.
7.  Denied the right to a Speedy Trial
8.  Indictment was not signed by Foreman or any other member of the Grand Jury.
9.  Detective Corbin violated the Exclusionary Rule.
10. The court errored when it allowed the testimony of a witness, who was not present at trial, therefore deprived the petitioner confrontation of that witness.
11. The state witnesses perjured themselves during the trial.
12. Suppression of defense witnesses, by trial counsel.

2.  The State has advised this Court that Williams' sentences for assault and for murder have been consolidated so that he is effectively serving a life term dating from June 15, 1963. Thus, Williams seemingly is "in custody" pursuant to his conviction and sentence for murder. But even if he were only serving the fifteen-year term for assault, Williams would nevertheless now be able to attack his murder conviction. Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed. 2d 426 (1968).

13. Trial counsel under influence of alcohol, and admitted to it.

14. Petitioner pleas double jeopardy.

15. Prejudicial remarks to jury, by State's Attorney

Each of Williams' allegations herein have been presented to the Court of Special Appeals of Maryland in his appeal from his conviction of murder and have not been granted. Additionally, further review has been declined by the Court of Appeals of Maryland. "It is the general rule that after issues have been *properly presented* on direct appeal from a conviction to the highest state court to which resort may be had, a federal habeas petitioner will be deemed to have fully complied with the exhaustion requirement, since resort to state courts may fairly be considered futile after the state's highest court has passed on the issues presented." Thompson v. Peyton, 406 F.2d 473, 474 (4th Cir. 1968) (emphasis supplied). An issue is "properly presented" on appeal only if "the factual matters necessary for a determination of the questions presented ' * * * appear on the face of the trial record without the necessity of developing the facts * * * in a supplemental proceeding.' Ganger v. Peyton, 379 F.2d 709, 710 [4th Cir. 1967]." Thompson v. Peyton, *supra* at 474–475. Williams' contention that he was denied effective representation of counsel and certain related contentions may not have been "properly presented" on direct appeal. In its affirmance of Williams' 1969 murder conviction, the Court of Special Appeals wrote (at pp. 7–8):

Appellant first contends that his trial counsel was incompetent and he was thus deprived of the effective assistance of counsel. His fifth contention is that the trial court erred in not dismissing counsel and appointing new counsel to argue the motion for a new trial. The matter of competency of counsel is not properly before this Court on appeal. Md.Rule 1085. Howard v. State, 3 Md.App. 173 [238 A.2d 135]; Boswell v. State, 5 Md.

App. 571 [249 A.2d 490]. We have repeatedly invoked Maryland Rule 1085 because counsel, as here, has no opportunity to defend himself on appeal from the accusations levelled against him. Boswell v. State, *supra.* Here the matter of competency of counsel was not raised until the time of disposition, at which time the trial judge took testimony and found that counsel was in fact competent. There is nothing in the record on appeal which would indicate other than that appellant was afforded the effective assistance of counsel. The refusal to discharge court-appointed counsel in accordance with the wishes of a defendant does not constitute error where there is nothing in the record to suggest that the attorney had not competently represented his client. Jennings v. State, 8 Md.App. 321 [259 A.2d 547]. We find no error in the trial court's refusal to discharge counsel and appoint new counsel to argue the motion for a new trial.

Williams' contentions 1, 3, 4 and 12 (*see* pp. 749–750 *supra*) all relate to the adequacy of counsel. Considering contentions 3, 4 and 12 separately, as well as together with contention 1, this Court agrees that "nothing in the record" in this case "indicate[s] other than that [Williams] was afforded the effective assistance of counsel." While Williams could have raised all ineffective counsel contentions under the Maryland Post Conviction Procedure Act, Md.Ann.Code art. 27, § 645A–645J, and thus could be said not to have fully exhausted state remedies as required by 28 U.S.C. § 2254, those contentions fall into the general category which Chief Judge Haynsworth has characterized as claims in connection with which "any competent lawyer would advise [Williams] that he was wasting his time if he undertook to persuade the [highest State court] to reverse itself, unless he was armed with some fresh argument . . . ." Evans v. Cunningham, 335 F.2d 491, 493 (4th Cir. 1964), in which Chief Judge Haynsworth held exhaus-

tion of a legal issue to a foregone conclusion is not required. While the Court of Special Appeals did not *decide* the competency-of-counsel issue upon Williams' appeal, and therefore would not be asked to *reverse* itself if those contentions should again be presented to it, and while the statutory construction issue in *Evans* is of a different type than Williams' competency-of-counsel issue, the unequivocal comment of the Court of Special Appeals as to the trial performance of Williams' counsel, following Judge Foster's most complimentary remarks in the motion for new-trial-sentencing hearing [3] concerning Williams' trial counsel's trial performance, all lead this Court to reach at this time the merits of Williams' counsel-type allegations and not require further state exhaustion. *See* Jenkins v. Fitzberger, 440 F.2d 1188 (4th Cir. 1971). In that connection, this Court notes that in its answer to Williams' within complaint, the State has taken the position that Williams' "contentions in this Court [in this case] have been fully adjudicated by the Court of Special Appeals of Maryland * * * and * * * should be denied by this Court for the reasons set forth by the Court of Special Appeals [in its opinion]." [4]

**I**

Williams claims that there was insufficient evidence to support his conviction. "There is a difference between a conviction based upon evidence deemed insufficient as a matter of state criminal law, and one so totally devoid of evidentiary support as to raise a due process issue. It is only in the latter situation that there has been a violation of the Fourteenth Amendment, affording the state prisoner a remedy in a federal court on a writ of habeas corpus." Grundler v. North Carolina, 283 F.2d 798, 801 (4th Cir.), cert. denied, 362 U.S. 917, 80 S.Ct. 670, 4 L.Ed.2d 738 (1960). *See also* Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). In this case, there was evidence, no part of which was supplied by the witness who was not present for cross-examination and about whom more appears hereafter, that groans and screams emanated from a room occupied by Williams and the deceased, and that on the following morning Williams acknowledged having struck the deceased. The record forcefully discloses that this case does not involve a conviction so totally devoid of evidentiary support as to raise a due process issue.[5]

3. *See p. 752, infra.*

4. In any event, failure to exhaust a single claim does not require this Court to dismiss petitioner's exhausted claims, *cf.* Dove v. Peyton, 343 F.2d 210, 213 (4th Cir. 1965), especially where the unexhausted claim is not inextricably intertwined with the principal, exhausted claims. United States ex rel. Levy v. McMann, 394 F.2d 402 (2d Cir. 1968).

5. The Court of Special Appeals, referring to Williams' three claims of insufficiency of evidence to support the conviction, erroneous denial by Judge Foster of Williams' motion for judgment of acquittal, and insufficiency of evidence of rape to support the conviction for murder in the first degree, wrote (at pp. 8–9):

> * * * Although phrased as three separate contentions * * *, the contentions are essentially the same, for if there was sufficient evidence to convict appellant of first degree murder, there was sufficient proof of rape and the action of the trial court in denying the motion for judgment of acquittal was proper. Article 27, § 410, Md.Code states, in pertinent part, "All murder which shall be committed in the perpetration of, or attempt to perpetrate any rape . . . shall be murder in the first degree." The autopsy showed that the cause of death was damage to the brain caused by a severe beating. The autopsy also revealed that the deceased had, prior to her death, engaged in sexual intercourse. The testimony of Sylvia Briscoe established that appellant was seen lying on the mattress in the kitchen with the deceased, that the deceased's blouse was open and her skirt up and upon the approach of Briscoe the appellant rose up off the mattress and pulled his pants up. The testimony of Eleanor Hunter and Sylvia Briscoe established that the deceased's face was bruised and swollen after her encounter with the appellant. The testimony of Eleanor Hunter established that when she told the appellant not to hit Barnes anymore, he

## II

■ Williams alleges that he was denied credit for the time he served while awaiting trial. The State has informed this Court that Williams' sentences have been consolidated so that he is effectively serving a life term dating from June 15, 1963. Since Williams has, prior to the date of the filing of this opinion, received credit toward his sentence from the date of his arrest, his contention in that regard has become moot.

## III

Williams' motion for a new trial, which was heard and denied by Judge Foster on July 23, 1969 before Williams' life sentence was imposed, was argued, at least in part, in proper person by Williams. To begin with, Williams charged his trial counsel with incompetency in connection with certain trial tactics and also with being under the influence of alcohol on July 18, 1969, and sought new counsel to argue the new trial motion and to represent him at sentencing. Williams' trial counsel testified on July 23, 1969 that on July 18, 1969 after the jury returned to deliberate he and the prosecutor each had one drink at a bar near the courthouse. Judge Foster found that defense counsel had conducted himself "brilliantly" during the trial and had "showed absolutely no evidence whatsoever of being under the influence of alcohol" (T.Tr. 309); and refused to discharge defense counsel and appoint another attorney in his place.[6]

■ On July 23, 1969, during the course of the hearing, Judge Foster heard testimony from Williams' mother and from defense counsel with regard to the allegations that a police officer who had testified at trial had violated the sequestration rule by talking to other witnesses who testified after him. Judge Foster found that the police officer in question had not been in the courtroom except when he testified. That finding is adopted by this Court pursuant to 28 U.S.C. § 2284; see Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), since Judge Foster's finding was based upon personal observation. The same status is accorded Judge Foster's statement that he as the trial judge had directed the officer to go to the jury room with the witnesses. But Judge Foster did not make any finding as to whether the officer violated the sequestration rule, as charged by Williams' mother, by passing information through another officer to subsequent witnesses. However, even if Judge Foster's sequestration ruling was violated, that violation, per se, raises no federal constitutional issue. Even assuming arguendo —and this Court makes no such finding —that Williams' allegations concerning communications between the police officer and other sequestered witnesses showed that the officer sought to suborn perjury, nevertheless, there is no indication that he was successful. Williams points out only minor inconsistencies between the testimony of the State's witnesses at the first murder trial and

replied "Okay." The testimony of Merriweather and Hunter established that groans and screams were heard emanating from the kitchen in Merriweather's apartment and that the only occupants of the kitchen were appellant and the deceased. The testimony of Hunter and Merriweather established that upon being awakened the next morning the appellant acknowledged having struck the deceased. From this testimony the jury could find that the appellant attempted to have sexual intercourse with the deceased, and when she refused severely beat her until she complied; and that the deceased died of the injuries inflicted upon her by the appellant. We find no error in the denial by

the trial court of the appellant's motions for judgment of acquittal. We further find that there was sufficient evidence before the jury for them to find the appellant guilty of murder in the first degree.

6. When the jury returned and its foreman announced its verdict, the record reveals that there was no further proceeding that day in that case except for that announcement and the polling of the jury (T. Tr. 285–88). Thus, even if a question is raised concerning the sobriety of Williams' trial counsel at that time, it had no effect upon the trial or trial counsel's performance at trial.

their testimony at the second murder trial. Moreover, those inconsistencies were thoroughly exploited on cross-examination by defense counsel during the second trial.[7]

## IV

■ In his original *pro se* petition herein, Williams devotes seven typewritten pages to his contention that witnesses for the State perjured themselves and points out minor inconsistencies between the testimony of witnesses in one or both of the two murder trials. Federal habeas corpus relief will not issue unless it is shown that there was a knowing utilization of perjury by the State. *See* Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). In this case, there is no such showing whatsoever.

## V

■ Williams alleges that his being subjected to a second trial violated the constitutional protection against double jeopardy.[8] That contention is without merit, for "reprosecution for the same offense is permitted where the defendant wins a reversal on appeal of a conviction." United States v. Jorn, 400 U.S. 470, 484, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971).

## VI

■ Williams contends that his indictment should have been dismissed because it was not signed by the foreman or any other member of the grand jury.

At page 10 of its opinion, the Court of Special Appeals disposed of that contention by noting:

> * * * The indictment as it appears in the record is signed by the foreman of the grand jury, and appellant's . . . contention is, therefore, patently frivolous. * * *

Williams has not given this Court even an intimation of evidence to the contrary. In any event, this contention presents no federal constitutional issue. *Cf.* 1 Wright, Federal Practice and Procedure § 103 (Criminal) (1970).

## VII

■ After Williams took the stand in his own defense, he was cross-examined with regard to his prior convictions for assault by shooting, larceny, three cases of assault by striking, carnal knowledge, and assault and cutting. Williams takes the position that cross-examination concerning his convictions for assault and carnal knowledge was constitutionally impermissible even for purposes of impeachment because the crimes were not crimes of "falsity and dishonesty". However, in a criminal case a witness may constitutionally be cross-examined about a prior conviction of a crime which is "a felony, infamous crime, petit larceny, or a crime involving moral turpitude." United States v. Pennix, 313 F.2d 524, 531 (4th Cir. 1963). *See also* proposed Federal Rule of Evidence 609(a).[9]

■ Williams argues that the State's Attorney improperly suggested to the jury in his untranscribed final argument to the jury [10] that Williams'

---

7. During the new trial motion hearing, there was also discussion of Williams' trial counsel not having called certain witnesses to testify. The record supports trial counsel's position that his course of conduct in those regards involved only choices of trial tactics.

8. Williams' contentions in that regard insofar as they are founded upon denials of credit for time served upon the earlier sentence have been mooted by the State's action in granting Williams credit against his current sentences for *all* time served since his arrest on June 15, 1963.

9. *But see* United States v. Hildreth, 387 F.2d 328 (4th Cir. 1967); Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763, 768–769 (1965), with regard to exercise of judicial discretion to exclude impeachment by cross-examination of prior convictions in instances involving prejudice.

10. At the time of Williams' second murder trial in July, 1969, Maryland Rule 32 provided that opening and closing statements of counsel in any case, criminal or civil, should be transcribed only when requested by counsel. By amendment dated August 2, 1971,

prior conviction could be considered as showing the moral character of Williams. The State contends that the prosecutor suggested only that the convictions indicated lack of credibility of Williams as a witness. However, even assuming, *arguendo* only, that Williams' version is accurate, the error seemingly was cured by the following portion of Judge Foster's charge to the jury:

> Of course, it is your sole responsibility to judge the credibility of the witnesses. You must decide who is telling the truth and who is not telling the truth. You are to determine the veracity of the witnesses. That is your obligation. And I refer to that specifically because there is a very definite, a very direct conflict as to the State's version of this case as compared to that of the defense.
>
> \*    \*    \*    \*    \*    \*
>
> Late in the trial, late this morning, there was some reference to the criminal record of the defendant. He voluntarily brought part of this to your attention. Subsequently the State's Attorney interrogated the defendant with reference to his record. The only reason that this is permitted is because it goes to the credibility or the veracity of a witness. What I'm saying also applies to the other witnesses who have testified in reference to their convictions. A prior criminal record, as far as the defendant is concerned, is not to have any bearing in your consideration of his innocence or guilt of the crime charged, but only pertains to the matter of his credibility or his veracity. The conviction of a crime may be considered in bearing

upon his truthfulness or his reliability as a witness, and it also applies to the witnesses who have testified. [T.Tr. 276–77, 278–79.] [11]

Additionally, however, Williams contends that the State's Attorney's cross-examination of him as to two sets of convictions at which Williams was not represented [12] was constitutional error.[13] Writing for himself and three other members of the Supreme Court, in a plurality opinion in Loper v. Beto, 405 U.S. 473, 483, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972), Mr. Justice Stewart stated:

> Unless Burgett [v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967)] is to be forsaken, the conclusion is inescapable that the use of convictions constitutionally invalid under Gideon v. Wainwright [372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)] to impeach a defendant's credibility deprives him of due process of law. We can put the matter no better than in the words of the Court of Appeals for the First Circuit:
>
> "We conclude that the Burgett rule against use of uncounseled convictions 'to prove guilt' was intended to prohibit their use 'to impeach credibility,' for the obvious purpose and likely effect of impeaching the defendant's credibility is to imply, if not prove, guilt. Even if such prohibition was not originally contemplated, we fail to discern any distinction which would allow such invalid convictions to be used to impeach credibility. The absence of counsel impairs the reliability of such convictions just as much when used to impeach as when used as direct proof of guilt." Gilday v. Scafa-

---

Rule 32(b) provides that in criminal cases such statements shall be transcribed when ordered by the Court, or requested by counsel with the Court's approval. No question has been raised concerning the validity or the application of Rule 32 in this case.

11. *Cf.* Frazier v. Cupp, 394 U.S. 731, 736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

12. Williams was cross-examined (T. Tr. 262–66) about three cases of assault by striking which occurred in 1957 and a case

of assault by cutting which occurred in 1960. At a hearing this Court held on May 18, 1973 the State stipulated that Williams was not represented at those trials by counsel.

13. That particular contention has not been exhausted in the state courts. The State, however, has not raised exhaustion on this point in this Court, and it therefore seemingly may be reached on the merits herein. *See* Jenkins v. Fitzberger, 440 F.2d 1188 (4th Cir. 1971).

ti, 428 F.2d 1027, 1029. [Footnote omitted.]

Mr. Justice Stewart also held (at 484, 92 S.Ct. at 1020) that the use of prior convictions to impeach Loper was unconstitutional "regardless of whether [they] * * * were used to impeach him before or after the Gideon decision." Mr. Justice Stewart noted (at 483 n. 12, 92 S.Ct. at 1019) that factually there was "little room for a finding of harmless error". Concurring in the result reached by the purality opinion in *Loper,* Mr. Justice White wrote (at 485, 92 S.Ct. at 1020) that in his view the Court's "prior decisions" do not hold that "there is no room in cases such as this for a finding of harmless error." *Cf.* United States v. Penta, 475 F.2d 92, 96 (1st Cir. 1973).

▇ The views expressed by the majority in *Loper* require the conclusion that constitutional error occurred in Williams' July 1969 murder trial. In this case, a determination as to whether lack of compliance with the requirements of *Loper* can or does constitute harmless error need not be made since that error, combined with the lack-of-confrontation error discussed *infra,* which can by no means be classified as harmless, requires that Williams either be granted his release or promptly retried. Additionally, there is present herein the speedy trial issue discussed *infra.*

### VIII

Williams urges that his Sixth Amendment right to be confronted by the witnesses against him was abridged because a witness was not called to testify during the second trial and, instead, the State read into evidence the testimony given by that witness at Williams' first trial. The witness, a Mrs. Sylvia Davis (nee Briscoe), was one of the three witnesses presented by the State who was present at or near the scene of the alleged murder. The conclusion is inescapable that her testimony was most important to the State's case.[14] Before a reading of Mrs. Davis' first trial testimony was permitted at the second trial, a Baltimore City Police Department detective testified to his unsuccessful efforts to locate the witness and stated:

> I did finally obtain information that she had apparently gone to Washington, D. C., after having been married and residing somewhere in Washington, D. C. But none of the persons that I spoke to were able to ascertain her marriage name. [T.Tr. 133.]

On appeal, the Court of Special Appeals concluded (at p. 14) that a "diligent inquiry [to locate Mrs. Davis had] been made" and that the "good faith effort" requirements of Barber v. Page, 390 U. S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), had been met. At a hearing held in this Court on May 18, 1973, that detective testified that his search for the missing witness commenced on June 13, 1969, and included attempts to locate her through inquiries made at the Department of Public Welfare, the Central Records Bureau, and the Marriage License Bureau of the City of Baltimore, as well as inquiries made in her former neighborhood.

The Sixth Amendment's right of confrontation, applied to the States by the Fourteenth Amendment, Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed. 2d 923 (1965), has traditionally permitted

> * * * an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. E.g., Mattox v. United

---

14. The importance which the State attached to the witness' testimony is amply demonstrated by the State's action in causing the lady to be held in protective custody as a material witness for two months prior to the original pre-*Schowgurow* trial. The importance attached by the Court of Special Appeals to Sylvia Davis' testimony is also to be noted. *See* pp. 748, 751, *supra.*

States, supra [156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1897)] (witnesses who testified in original trial died prior to the second trial). This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement. See 5 Wigmore, Evidence §§ 1395–1396, 1402 (3d ed. 1940); C. McCormick, Evidence §§ 231, 234 (1954).

Barber v. Page, *supra,* 390 U.S. at 722, 88 S.Ct. 1318. However, a witness is deemed so unavailable only if he cannot be located after what is described in *Barber* (at 725, 88 S.Ct. 1318) as a "good faith effort" by the prosecution. *See, e.g.,* Gorum v. Craven, 465 F.2d 443 (9th Cir. 1972). *See also* United States v. Singleton, 460 F.2d 1148, 1152–1153 (2d Cir. 1972).

■ In this case, the question arises as to whether the State's forbearance from further efforts to locate Mrs. Davis after learning that she might reside in another jurisdiction, satisfies the mandate of *Barber.* *See* Britton v. Maryland, 298 F.Supp. 641 (D.Md.1969). But even if *Barber* was not thereby offended, there is a separate fatal flaw in the State's proffer of unavailability—namely, that the same sources which were checked in 1969, when rechecked in 1973 through the efforts of Williams' counsel appointed by this Court, speedily and easily led to the missing witness. That attorney has filed in this case an uncontradicted affidavit of a young law clerk with no investigative experience, whom the attorney asked to attempt to locate Mrs. Davis. That affidavit reveals that in the course of an expenditure of four hours the law clerk discovered (a) the marriage license of the witness at the marriage record bureau, (b) that the witness was then, as well as at the time of the second trial, receiving public assistance from the Department

of Social Services of Baltimore, and (c) that that agency possessed during the second murder trial the witness' then current address. It is true that the fact of failure in 1969 and the fact of success in 1973 do not themselves require a finding of lack of good faith. When it is considered, however, that the 1973 success came about through documents apparently existing in 1969, and that those documents were found at the same sources checked in 1969, and that those sources were among those that would normally be checked in the course of a good faith effort, the conclusion is inescapable that the 1969 search was so lacking in diligence as to constitute, as a matter of law, a lack of good faith.

This Court therefore concludes that the State has not met the burden imposed by *Barber* before the substitution of prior testimony for a live witness may be permitted. In so holding this Court does not indicate any doubt as to the subjective good faith of those who sought Mrs. Davis; but rather that when the State represents that sources of information were diligently checked and found to be barren, the State must bear the brunt of a conclusive demonstration that those sources were full of fruit and that the fruit was easy to locate and to harvest.

■ Admission of the previous testimony in lieu of the live testimony of the witness in this case is not harmless error. In Berger v. California, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969), the Supreme Court wrote as follows in a per curiam opinion: " * * * As we pointed out in Barber v. Page, one of the important objects of the right of confrontation was to guarantee that the factfinder had an adequate opportunity to assess the credibility of witnesses. * * * " After quoting that sentence, this Court in Britton v. Maryland, *supra* at 646 of 298 F. Supp. stated:

It is often, if not always, impossible to gauge precisely the importance of

an intangible quality like demeanor in any given case. When the testimony of a particular witness supplies only a minor link in the prosecution's case and there is no reason on the surface to doubt that witness' veracity and his ability to observe and remember, then the relative weight to be attached to his demeanor may be only minor and the importance of the credibility factor may be diminished. On the other hand, when the witness' testimony forms a substantial part of the incriminating evidence, or when there is substantial doubt as to his capacity to observe and remember, then observations by the trier of fact of the demeanor and credibility of that witness may well tip the scales in the case. It is the latter situation which is present here. [The missing witness'] . . . testimony was the *only* incriminating evidence offered against Britton. Further, at the time of the first trial, [the missing witness] . . . was but fifteen years old. Because of the joint presence of those two factors, the risk of harm in using a printed transcript of [the missing witness'] . . . testimony is magnified. [Emphasis in original.]

Although the testimony of the missing witness, Mrs. Davis, was not the only incriminating evidence, it was very damaging to Williams. During Williams' first, pre-*Schowgurow* murder trial, the trial judge, Judge Harris, noting the nervousness and hesitancy of the witness, commented:

* * * [I]n view of the fact that it is obvious to the Court that this witness is extremely nervous in her manner and hesitant in her testimony on the stand; and in her admissions that some things she said in her first statement are inconsistent with what she is testifying to from the witness stand today, I will permit the State's Attorney to impeach the witness and cross-examine her. [T.Tr. 169.]

The nervousness noted by Judge Harris came close to attaining the level of inability to testify on the witness stand and involved extreme emotional stress when the witness testified in this Court in this case on December 20, 1972, after she had been located by Williams' counsel and after she most reluctantly obeyed a subpoena to appear and testify. In this Court the witness broke down almost completely, despite every effort of Court and counsel to avoid tension and maintain calm. While this Court of course did not have the opportunity to observe the witness during the trial before Judge Harris, Judge Harris' comments plus this Court's observation of the witness in this habeas corpus proceeding lead this Court to the conclusion that the defendant was substantially prejudiced by not having the jury which convicted him at the second trial view and listen to the witness. Additionally, it is to be noted that because he felt that Mrs. Davis had been so substantially led in the course of her direct examination during the first murder trial, Judge Foster, during the second murder trial, struck 15 pages of the witness' testimony, after that testimony had been heard by the jury.[15]

Accordingly, this Court holds that Williams was denied his Sixth Amendment right to confront the witnesses and that Williams for that reason is entitled to the grant of the habeas corpus relief he seeks herein, and therefore is entitled to be released from confinement unless promptly retried. However, there also remains the question of whether Williams is not entitled to his release at this time, without the State having the right to opt for a new trial, for another independent reason, *i. e.*, denial of a speedy trial, for which the lone remedy is an absolute discharge from all charges. Strunk v. United States, 412 U.S. 434, 439–440, 93 S.Ct. 2260, 37 L. Ed.2d 56 (1973); Barker v. Wingo, 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

15. Judge Foster instructed the jury not to consider that testimony.

## IX

The following chronology of events forms the factual context in which the speedy trial issue posed by Williams must be considered:

| | |
|---|---|
| July 28, 1962 | Death of Theresa Barnes (murder case). |
| June 15, 1963 | Arrested and jailed in connection with the *Nolan* case (assault case). |
| November 26, 1963 | Williams served with warrant charging him with the murder of Theresa Barnes. |
| January 21, 1964–<br>January 23, 1964 | Trial of *Nolan* case—guilty verdict. |
| January 29, 1964–<br>January 31, 1964 | Trial of *Theresa Barnes* case—guilty verdict. |
| May 13, 1965 | Sentenced in the *Barnes* case to the Maryland Penitentiary for life by Judge Harris. |
| May 13, 1965 | Sentenced by Judge Grady in the *Nolan* case to fifteen years in the Maryland Penitentiary to run consecutively with the life sentence in the *Barnes* case. |
| January 11, 1966 | The Court of Appeals of Maryland remanded Williams' appeals in both cases in light of the *Schowgurow* decision. |
| March 10, 1966 | Motions to dismiss the indictment in both cases were granted. |
| June 28, 1966 | New indictment in *Nolan* case. |
| June 28, 1966 | New indictment in *Barnes* case. |
| July 8, 1966 | Arraigned and pleads "not guilty" in both cases. |
| July 16, 1966 | Letter by Williams to his attorney concerning September trial date. |
| July 18, 1966 | Transferred from Maryland Penitentiary to Baltimore City Jail. |
| September 25, 1966 | Letter by Williams to his attorney: "Do you happen to know the date that I will be going to court?" |
| November 20, 1966 | Letter by Williams to his attorney: ". . . [N]ow if it's close to trial time, then I think we should talk." |
| December 2, 1966 | Letter by Williams to his attorney stating it had been three-and-a-half years since original arrest and inquiring as to which case would be coming up and when. |
| May 21, 1967 | Letter by Williams to his attorney: "When will we be going to trial . . . ." |
| November 22, 1967 | Letter by Williams to his attorney: "I know I shouldn't be held here this long . . . I am entitled to a fast and speedy trial . . . . What are we waiting for?" |
| March 7, 1968 | Letter by Williams to his attorney: "I humbly ask that you set my case in for trial." |

| | |
|---|---|
| June 16, 1968 | Letter by Williams to Judge Shirley Jones inquiring if Williams' trial counsel was still his attorney and referring to the great amount of time that had passed since the arraignment in July of 1966. |
| June 16, 1968 | Letter by Williams to his attorney. |
| June 21, 1968 | Letter from Judge Shirley Jones to the State's Attorney requesting that this matter be given prompt attention so that it may be brought to a conclusion without further delay. |
| June 21, 1968 | Letter from Judge Jones' law clerk to Williams advising that Judge Jones had brought Williams' complaint to the attention of State's Attorney's Office with the direction that his case be given prompt attention. |
| July 4, 1968 | Letter by Williams to his attorney asking why we didn't go to court on the 3rd of July and if there is a date planned for trial. |
| July 12, 1968 | Letter from his attorney to Williams stating that he had requested the State to set an early trial date. |
| July 12, 1968 | Letter from Williams' attorney to State's Attorney's Office requesting an early trial on both indictments. |
| July 12, 1968 | Motion for Speedy Trial filed by Williams' attorney which contained incorrect indictment number. |
| July 23, 1968 | Williams' lettter to his attorney pointing out the mistake in the indictment number on the Motion for Speedy Trial. |
| August 10, 1968 | Letter by Williams to his attorney: "I suppose there is nothing more that can be done for awhile, unless it's time to send a 'demand' for a speedy trial." |
| October 7–8, 1968 | Retrial in *Nolan* case, found guilty by Judge Liss and sentenced by Judge Liss on October 8, 1968 to a term of fifteen years dating from June 15, 1963. |
| May 27, 1969 | A detective in the Baltimore City Police Department begins to look for Sylvia Briscoe. |
| June 6, 1969 | Court of Special Appeals of Maryland affirms judgment in *Nolan* case. |
| July 17–18, 1969 | Retrial of *Barnes* case, jury verdict of guilty of first-degree murder without capital punishment. |
| July 23, 1969 | Motion for New Trial heard and denied. Sentenced by Chief Judge Foster to serve a term beginning at the expiration of the sentence Williams was then serving in the *Nolan* case. |

760

Court of Special Appeals of Maryland affirms judgment in *Barnes* case with remand to lower court to give Williams credit for time served from January 30, 1964, the date of his original conviction for murder until March 10, 1966, date of dismissal of original indictment.

The framework of analysis for a speedy trial claim has been explicated by Mr. Justice Powell, speaking for a unanimous Court, in Barker v. Wingo, *supra*. Eschewing "both of the inflexible approaches—the fixed [maximum]-time period because it goes further than the Constitution requires; the demand-waiver rule because it is insensitive to a right which we have deemed fundamental", the Court adopted "a balancing test, in which the conduct of both the prosecution and the defendant are weighed". *Barker*, 407 U.S. at 529–530, 92 S.Ct. at 2191. *See* Smith v. Cox, 474 F.2d 563 (4th Cir. 1973). While not purporting to list all relevant factors, Mr. Justice Powell (407 U.S. at 530, 92 S.Ct. at 2192) enumerated four circumstances to be balanced in weighing a particular claim, "[1] [l]ength of delay, [2] the reasons for the delay, [3] the defendant's assertion of his right, and [4] prejudice to the defendant."[16]

A. *Length of Delay.*

■ When so extended as to be presumptively prejudicial, length of delay becomes the "triggering mechanism" for embarking on further speedy trial analysis. *Barker* at 530, 92 S.Ct. 2182. In the instant case, although re-indicted on June 28, 1966, Williams was not tried until July 17, 1969. Such a delay—one of slightly more than three years—requires this Court—under Barker v. Wingo—to undertake a most careful examination.[17]

B. *Reasons for Delay.*

Substantial periods of delay have been held not to violate a defendant's right to a speedy trial when the delay has been caused in whole or large part by the defendant's own actions.[18] In this case,

16. "Several other considerations are also inherent in the *ad hoc* approach which the *Barker* decision requires—the gravity of the charged offense and the likelihood of repetition, the number and complexity of legal and factual issues involved, the availability of evidence, etc." United States v. Dyson, 469 F.2d 735, 739 (5th Cir. 1972) (Brown, C. J.).

17. In United States v. Infanti, 474 F.2d 522 (2d Cir. 1973), the Court undertook a *Barker* analysis even though it found the delay was not "extraordinary" (at 527). *And see* United States v. Holt, 145 U.S.App.D.C. 185, 448 F.2d 1108 (1971), in which a claim of denial of speedy trial was said (at 1109) to have "prima facie merit if the time lapse between arrest and trial is longer than one year".

18. *See, e. g.*, Torres v. Florida, 477 F.2d 555 (5th Cir. 1973) (in which the reasons stated for a seventeen-month delay included recovery period of a principal witness from gunshot wounds inflicted upon that witness by the defendant as well as multiple pre-trial motions filed by the defendant, one of them a writ of prohibition to the Supreme Court of Florida seeking a bar to trial); United States v. Weber, 479 F.2d 331 (8th Cir. 1973) (defendant was a fugitive for all of the twenty-one month gap between indictment and trial except for approximately the last two months or less); *United States v. Parish*, 152 U.S.App.D.C. 72, 468 F.2d 1129 (1972) (defendant was a fugitive for two months of the seven-month delay). *And see also* United States v. Stribling, 469 F.2d 443 (6th Cir. 1972) (a delay of nearly four years was substantially at defendant's request); United States v. Lane, 465 F.2d 408 (5th Cir. 1972) (twenty-five pre-trial motions were submitted by defendants); United States v. Rosenstein, 474 F.2d 705 (2d Cir. 1973) (defendant requested delay for the last part of a nearly three-year delay). Other cases involving delay at least in part attributable to defense pre-trial motions or requests include United States v. Churchill, 483 F.2d 268 (1st Cir. 1973); United States

however, the State has not directed this Court's attention to any motions—apart from a motion for a speedy trial—or requests for continuances, or any other post-reindictment—pre-trial actions by Williams herein. Moreover, courts have refused to find a violation of constitutional rights when the time lag was attributable to causes outside the prosecutor's control such as a missing witness or a missing codefendant.[19] The delay herein, however, was not occasioned by the State's search for a missing witness, since the State did not begin its pre-second trial search for Mrs. Davis until June 13, 1969—almost three full years after Williams' re-indictment.[20] While the factors that normally excuse delay are absent, nevertheless this case does not present an example of arbitrary, oppressive or vexatious behavior by the prosecution.[21] A large part of the delay herein clearly resulted from the staggering burden imposed on the trial courts in the City of Baltimore by the *Schowgurow* mandate which caused all pending indictments that had not yet resulted in a final conviction to be subject to dismissal at the option of the individual in-

dicted and which thus required prosecutorial and judicial steps to be retraced. Forty-three defendants, indicted by Baltimore grand juries, of whom Williams was one, took that option, and were reindicted between April and August of 1966. However, of the cases involving the other of those forty-three *Schowgurow* defendants, twenty-three were retried or otherwise disposed of at the trial level by the end of 1966. Another fifteen were so disposed of by the end of 1967. Of the four remaining, two were completed at the trial level by May 1968; one by October 1968; and one in July 1969. The latter two cases were delayed by the respective defendants' referrals to Clifton T. Perkins Hospital for sanity determinations. Accordingly, it would not appear that *Schowgurow* problems caused the delay in this case beyond May 1968 at the latest. And over a year elapsed between that month and Williams' second murder trial.

In Barker v. Wingo, *supra*, 407 U.S. at 531, 92 S.Ct. at 2192, the Court described overcrowded dockets as "[a] more neutral reason * * * [that] should be weighed less heavily but nev-

v. Phillips, 477 F.2d 913 (5th Cir. 1973); United States v. Nathan, 476 F.2d 456 (2d Cir. 1973); United States v. Taylor, 469 F. 2d 284 (3d Cir. 1972). *Cf.* United States v. Phillips, 482 F.2d 191 (8th Cir. 1973) (codefendant sought a series of continuances); United States v. Galardi, 476 F.2d 1072 (9th Cir. 1973) (Government mistakenly thought defendant desired to exercise a Federal Criminal Rule 20 option); United States ex rel. Little v. Twomey, 477 F.2d 767 (7th Cir. 1973) (in which part of the delay was incurred until defendant became competent to stand trial).

19. United States v. Fasanaro, 471 F.2d 717 (2d Cir. 1973) (four-year delay occurred while Government sought a missing witness); United States v. Anderson, 471 F.2d 201 (5th Cir. 1973) (ten-month delay occurred while Government sought a missing witness); United States v. Counts, 471 F.2d 422 (2d Cir. 1973) (one of the factors considered was that the delay during last month of a sixteen-month delay was occasioned by the chief government witness' absence in Vietnam). *Cf.* United States v. DeTienne, 468 F.2d 151, 157 (7th Cir. 1972), cert. denied, 410 U.S. 911. 93 S.Ct. 974, 35 L.Ed.2d

274 (1973), in which a nineteen-month delay occurred while the Government tried to capture a co-defendant for joint trial and in which Judge Cummings wrote: "* * * While the Government's pragmatic desire to try the participants in a criminal scheme together hardly warrants unquestioning acceptance when pitted against a single defendant's right to a speedy trial, on the scale of possible justifications for the delay, this reason deserves some deference here."

20. Hearing in this Court Tr. 5 (5/18/73).

21. *See, e. g.,* Arrant v. Wainwright, 468 F.2d 677 (5th Cir. 1972), in which the Court noted (at 681):
   * * * The state attorney who handled this case quite candidly stated to the district court under oath that he kept putting off trial because he "did not want to see him [appellant] be acquitted of this crime." Thus, this is the only viable excuse for the delay that this court will accept for the period after October 16, 1967. Needless to say, this Court finds this asserted justification extremely unsatisfactory and will weigh this element heavily in the ultimate determination of appellant's claim.

ertheless [that] should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." It would seem that the State sought to handle its *Schowgurow*-flooded docket expeditiously, and that it should hardly be faulted for delays of a year or eighteen months while it handled that burden. But the State has, up to this time, advanced no facts to explain why the Williams retrial was not held until one year after all of the *Schowgurow* retrials (except for two in which the defendants were mentally ill patients) took place.

### C. *Assertion of the Right to Speedy Trial.*

The view that failure to request a speedy trial constituted a waiver of that right was rejected in *Barker* by the Supreme Court. Rather the Court suggested that assertion or non-assertion of that right was "entitled to strong evidentiary weight", *Barker*, 407 U.S. at 531, 92 S.Ct. 2182, in assessing the reasons for the delay, and in determining what deprivation or prejudice, if any, a defendant suffered.[22] In the instant case, Williams, between 1966 and August 1968, repeatedly sought trial, although most of his requests were not conveyed to the trial court. As early as September 1966, two months after his arraignment, Williams asked his attorney when he was again to be tried. In letters in November and December 1966 and May 1967, Williams again inquired as to his trial date. In November 1967, he wrote his attorney: "I know I shouldn't be held here this long . . . I am entitled to a fast and speedy trial. . . . What are we waiting for?" Williams

again, in March 1968, requested his attorney to have a trial date set. Finally, in June of 1968, Williams wrote directly to Judge Shirley Jones, a Judge of the Supreme Bench of Baltimore City, complaining of the time that had passed since his arraignment. Within a week of that letter, Judge Jones requested the State's Attorney to give prompt attention to Williams' case. Following another letter from Williams to his attorney in July 1968, his attorney formally filed, albeit with an incorrect indictment number, a motion for speedy trial. Finally, Williams wrote to his attorney one more time suggesting a demand for a speedy trial in August 1968. Between September 1966 and August 1968 Williams was pressing for a speedy trial and indicating the burden of delay which he felt. *See Barker*, 407 U.S. at 531, 92 S.Ct. 2182. Nevertheless, those communications by Williams which went no further than his attorney can hardly be laid at the State's doorstep. The same is not the case with regard to Williams' letter to Judge Jones and Judge Jones' communication to the prosecutor. Indeed, the current record in this case discloses no reason for the apparent negligence of the State in its continuing failure to prosecute Williams for one year after Judge Jones' communication to the State's Attorney in July 1968.

### D. *Prejudice.*

Mr. Justice Powell suggested in *Barker* (at 532, 92 S.Ct. at 2193) at least three types of prejudice resulting from undue delay: "(i) * * * oppressive pretrial incarceration; (ii) * * * anxiety and concern of the accused; and (iii) * * * the possibility that the defense will be impaired."[23] In the in-

---

**22.** "We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Barker v. Wingo, *supra* 407 U.S. at 532, 92 S.Ct. at 2193.

**23.** "Of these [*i. e.,* the three types of prejudice], the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the

entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown." Barker v. Wingo, *supra* at 532, 92 S.Ct. at 2193. *And see* Chauncey v. Second Jud. Dist. Ct., 474 F.2d 1238 (9th Cir.

stant case, Williams seemingly suffered the second of the deprivations listed. As to the first deprivation, it is difficult to assess the effect the delay in the second murder trial had upon the type of incarceration to which Williams was subjected. "The time spent in jail awaiting trial has a detrimental impact on the individual. * * * Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time." Barker v. Wingo, *supra* at 532–533, 92 S.Ct. at 2193.[24] Williams did spend part of the time between his *Schowgurow* election and the affirmance of his conviction after his second murder trial by the Court of Appeals of Maryland, in the Baltimore City Jail, apparently in pre-trial detention. But because Williams was held during one period of time in pre-trial confinement prior to his second trial for assault as well as because of the pendency of his second trial for murder and because after his second trial for assault he was held in post-trial confinement, it is not clear how much of the period of delay before the second murder trial caused Williams to be held in a limbo-type of confinement.

Mr. Justice Powell stressed in *Barker* the need to approach close speedy trial issues on an *"ad hoc* basis" (Barker v. Wingo, *supra* at 530, 92 S.Ct. 2182). Approaching the speedy trial question in this case on that basis, this Court believes that it would be desirable for the parties to present additional evidence, either by stipulation or during a further evidentiary hearing, concerning where and why Williams was confined from and after July 1968, whether any of the post-July 1968 delay in holding Williams' second trial was in any way caused by the number of criminal cases which grew out of the riots in the City of Baltimore following the death of Martin Luther King in the month of April 1968, why Williams was tried on the assault charge in October 1968 rather than on the murder charge, why Williams seemingly made no request for a speedy trial for murder after his October 1968 conviction for assault, why Williams' second murder trial did not occur until after Williams' second assault trial conviction had been affirmed by the Court of Special Appeals of Maryland, and what light, if any, Williams' attorney (the same lawyer represented him in both the assault and murder trials in October 1968 and July 1969) and one or more members of the Office of the State's Attorney of Baltimore City can throw upon those questions. As of this date, the record in this case does not suggest that either the State or Williams had any identifiable advantage to be won by delaying the second murder trial at any time after Williams pressed for the same in his letter to Judge Jones in July 1968. *Cf.* United States v. Saglimbene, 471 F.2d 16 (2d Cir. 1972). But answers to the factual questions raised by this Court in the preceding sentences of this opinion may otherwise

1973), in which the Ninth Circuit, holding in a per curiam opinion that there had been a lack of speedy trial after letter demands by the petitioner, wrote (at 1239–1240):

  * * * Although we are not confronted with a deliberate attempt to delay the trial in order to hamper the defense, the more neutral reason that the state ascribes to the delay here, being akin to negligence, must be weighed against the state. Barker v. Wingo, 407 U.S. 514, 531, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Likewise, the other factors delineated in Barker v. Wingo weigh in Chauncey's favor. He has sedulously and tenaciously asserted his right, and the prejudice he has suffered is amply explained in Smith

v. Hooey, *supra* [393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607].

24. "We recognize, as the Court did in Smith v. Hooey, [393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969)] that the stress from a delayed trial may be less on a prisoner already confined, whose family ties and employment have been interrupted, but other factors such as the prospect of rehabilitation may also be affected adversely." (Footnote omitted.) Strunk v. United States, 412 U.S. 434, 439, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56 (1973). In *Strunk*, the defendant was held in confinement, during the period of delay, in connection with service of sentence for another offense.

indicate. The resolution of a speedy trial issue is an absolute one—the petitioner is either denied relief or goes free —thus, there is no tomorrow. Before making such a final determination in this case, this Court seeks the views of counsel for the parties as to whether additional evidence should be presented.

For the reasons set forth under VIII *supra*, this Court is ready at this time to order that Williams' petition for habeas corpus relief be granted, subject to the proviso that that grant shall not become effective until the expiration of that period of time during which the State can note an appeal to the United States Court of Appeals for the Fourth Circuit; and with the further proviso that if the State so appeals, that grant of relief will not become effective until the final disposition of this case upon appeal. However, before issuing that order, this Court hereby affords to counsel for both sides the opportunity to inform this Court with regard to their views as to whether this Court should receive further evidence in connection with the speedy trial issue.

### MEMORANDUM AND ORDER

Reference is made to an opinion filed in this case on March 28, 1974. Reference is also made to the attached communication dated April 2, 1974 filed by the State. Since the State has declared that it does not desire to retry Williams on the murder charge and further does not desire to appeal from the holding of this Court stated in this Court's March 28, 1974 opinion, the issue of speedy trial has become moot. Accordingly, no further evidence in connection therewith will be taken. Accordingly also, the State is hereby ordered to expunge the conviction of the defendant upon the charge which was the subject of that second murder trial and not to hold the defendant in confinement from and after the date of this Memorandum and Order, in connection with the second murder charge and/or conviction therefor.